1  PAUL I. MYERS III, Bar No. 72067
   ALEXANDER P. MYERS, Bar No. 136370
2  MYERS, HAWLEY, MORLEY, MYERS & McDONNELL
3  166 Main Street
   Los Altos, California 94022-2905
4  Telephone: (650) 948-1600
   Fax: (650) 949-3581
5  e-mail: chicolaw@att.net

6
   Attorney for Third Party Respondent
7  EXP PHARMACEUTICAL SERVICES CORP.

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                   OAKLAND DIVISION

11

12 PHARMACEUTICAL INVENTORIES,        )   Case No. CV-07-80231-MSC SBA
   INC. d/b/a PHARMACEUTICAL          )
13 RETURNS SERVICE,                   )   **DECLARATION OF GUS
                                      )   CHANGARIS IN SUPPORT OF
14                                    )   OPPOSITION OF EXP
              Plaintiff,              )   PHARMACEUTICAL SERVICES
15                                    )   CORP. TO MOTION TO COMPEL
16 vs.                                )   PRODUCTION OF DOCUMENTS**
                                      )
17 MICHAEL ZACCARO and RETURNS R.     )
   US, INC. d/b/a/ PHARMA LOGISTICS,  )
18 LTD.,                              )   Date:      November 6, 2007
              Defendants.             )   Time:      1:00 p.m.
19                                    )   Courtroom: 3, 3rd Floor
                                      )   Judge:     Hon. Saundra Brown Armstrong
20 _____  )

21
          I, Gus Changaris, declare as follows:
22
          1.    At all times herein mentioned I have served as the Chief Executive Officer of EXP
23
   PHARMACEUTICAL SERVICES, CORP. ("EXP"), a California corporation with its principal
24
   place of business in the City of Fremont, County of Alameda, California. I am competent to testify
25
26 as to the matters set forth herein.
27

28
   DECLARATION OF GUS CHANGARIS IN SUPPORT OF OPPOSITION OF EXP PHARMACEUTICAL
        SERVICES CORP. TO MOTION TO COMPEL PRODUCTION OF DOCUMENTS : Page 1

2. I am in receipt of the Subpoena issued by Defendants Michael Zaccaro (hereinafter "Zaccaro") and Returns R Us Incorporated d/b/a Pharma Logistics Ltd (hereinafter "Pharma Logistics"), collectively referred to as "Defendants." This Subpoena demands the production of records of EXP. EXP objects to the production of records, except those already produced, requested in the Subpoena. This Court should be aware of the following facts:

   a. EXP is not a party to the above-entitled proceeding between Pharmaceutical Returns (hereinafter "Plaintiff") and Defendants which gave rise to the Subpoena. EXP is not involved in any of the claims or defenses in this action. EXP is not connected in any way to either Plaintiff or Defendants, except as a competitor, and is unaware as to why the information is requested from EXP.

   b. EXP does not have, has not used, has not inspected, and has no knowledge of the "source code" which is the subject of the primary litigation. (See Declaration of John D. Minton, filed October 1, 2007, Exhibit B, ).

   c. In fact, EXP has expended millions of dollars over the past fourteen years in the creation, implementation, revision, and adaptation of its own source code and software designed to operate the EXP internal product and service management programs employed at EXP.

   d. EXP is a direct competitor of Plaintiff and Defendants.

   e. I am informed and believe, based upon information received from others, that Defendants have served subpoenas, similar to the Subpoena issued to EXP, to just about every major entity and person working in the business of reverse distribution of pharmaceutical products. A list of these subpoena recipients is set forth in the Certification of Interested Persons or Entities filed herewith.

3. This declaration is submitted in support of EXP's opposition to the Motion to Compel filed by Defendants. The opposition is based upon the fact that production of the documents requested would impose an undue burden on EXP and would require the disclosure of trade secrets, proprietary and other confidential information of EXP. Further, I am informed and believe that Defendants may obtain the information they seek from other sources that are more convenient, less burdensome or less expensive to EXP. The burden or expense imposed on EXP in producing the requested documents outweighs any potential benefit to Defendants.

4. EXP is in the business of reverse distribution of pharmaceutical products. This is a highly competitive industry, with several firms, such as EXP, and Plaintiff and Defendants herein, conducting operations on a national and international basis. For any one company to have access to the information and software of a competitor, such as the information demanded by Defendants from EXP, would provide an advantage to the receiving company, and would result in catastrophic losses to EXP.

5. The reverse distribution of pharmaceutical products involves providing a service to a pharmaceutical customer in the form of returning unused pharmaceutical products for credit, or for destruction. The industry is characterized by its highly competitive nature. The list of potential customers in the United States is finite. Therefore, a customer gained by one distributor is a loss for another distributor. Driven by aggressive competition, margins on each return transaction are maintained at razor-thin levels. The success of a company in this industry is built upon a high volume of transactions, and its own internal efficiencies in managing its service, and maintaining customer satisfaction.

6. A further feature of the industry is that it is closely regulated by numerous state and federal agencies. These agencies mandate specific handling and reporting protocols for the

distribution and reverse distribution of pharmaceutical products. Reporting requirements are strictly enforced and penalties for failure to comply are imposed. In order to protect itself, and its customers, EXP and its competitors, must scrupulously account for, and provide reports for each and every pharmaceutical return transaction. For EXP, the internally created software and computer controls allow us to monitor millions of pharmaceutical return transactions.

7.  Aside from processing a high volume of return transactions, EXP must look to cutting-edge cost control measures in order to remain competitive, remain profitable, and maximize the returns provided to their customers. One such efficiency measure employed by EXP was to internally develop software that efficiently tracks the return of pharmaceutical products, complies with regulations imposed by the federal government, and all 50 states, not to mention local jurisdictions, and provides reports to customers. This software, used by certain employees of EXP, features a series of hundreds of screen images. These images, which are unique to the EXP software, disclose, inter alia, methods of data entry, data processing, transactional histories, reporting requirements, and customer requirements, in addition to the design of the screen image itself. The viewing of even a single screen image will reveal confidential and trade secret information about the software. In fact, the screen image is a representation of the software, and the source code that produces it. A viewing of the screen is tantamount to a direct review of the source code. Defendants' suggestion that an examination of a Screen Print leaves the source code protected is, in fact, untrue.

8.  Since its founding in 1994, EXP has spent several million dollars, and countless hours of employee time, in the development of its internal software. My own estimate would be that over $8,000,000.00 of EXP funds have been invested in software design, development and adaptation since 1994, and that in excess of 100,000 worker-hours of labor have been devoted to the

development of the software during the same period. This represents a massive investment for a company the size of EXP, but we consider that the result, a unique software program designed to efficiently support the reverse distribution business, to be worth the effort. This software was developed internally by EXP, from scratch and without reference to software of any other competitor. It has been refined and revised continuously by EXP over the past fourteen years. It is proprietary to EXP and a trade secret of EXP. This software is, in fact, the "crown jewels" of EXP (the gratuitous argument to the contrary in the moving papers, notwithstanding). It is this software, or the Screen Prints derived from this software, that Defendants would now like to review. Aside from the initial and ongoing investment to produce the software, EXP has in place extensive procedures and protections to protect the software from disclosure to those beyond the walls of EXP, and most especially competitors. Third parties are not allowed access to this software, or Screen Prints. The number of EXP employees with knowledge of the software, or even a part of it, is limited. All designers and others are required to execute strict confidentiality agreements before access is permitted. Persons outside of EXP are not permitted to obtain or retain copies of the software, or Screen Prints.

9.   According to the moving papers, Defendants are accused of gaining "unauthorized access" to Plaintiff's source code, and copying it. Thereafter, Defendants are accused of using the software in their own business enterprise. (See Declaration of John D. Minton, Exhibit B, Paragraph 11 of the Complaint). Based upon this premise (about which EXP has no information whatsoever), Defendants have issued a Subpeona which sought the following items from EXP, for the 14-year period of 1994 to the present:

"1.   Training or user manuals for any pharmaceutical returns software owned or licensed by EXP.

2. Documents sufficient to show the overall design of any pharmaceutical of any pharmaceutical returns software owned or licensed by EXP.

3. Documents sufficient to show representative computer screen layouts for any pharmaceutical returns software owned or licensed by EXP.

4. Representative sample reports generated by any pharmaceutical returns software owned or licensed by EXP."

(See Declaration of John D. Minton, Exhibit A, Exhibit A to Supoena Duces Tecum, Instructions and Definitions, pages 2 and 3).

10. By way of justification, Matthew C. Walch, Esq., attorney for Defendants, in his cover letter of July 13, 2007, states "The requested information regarding the software program(s) used by EXP will help prove to PRS (plaintiff, Pharmaceutical Inventories, Inc.) and its counsel that software within this industry has to incorporate certain fields, commands and functionality to serve the needs of the customer in this industry and that such fields, commands and functionality are not and cannot be owned by any one business in this industry." (See Declaration of John D. Minton, Exhibit A).

11. My responses to these assertions are,

a. I cannot believe that EXP software, or Screen Prints, produced internally at EXP, can have any bearing on whether Defendants wrongfully accessed, copied, or used software developed by Plaintiff.

b. The fact that Defendants seek Screen Prints created and/or used by EXP establishes that the Subpoena is unduly burdensome, overbroad, and vague. These Screen Prints, which are used internally at EXP, will disclose the nature and function of the software that created it. Methods of data entry, routing of information, directions to operators to forward data or create

reports, among other things, as well as the source code which creates these functions, will all be revealed by reference to the Screen Prints which are sought by Defendants.

      c.     There is no mandate that a company in the pharmaceutical return industry include "certain fields, commands and functionality" in its software. The inclusion of functions, or ordering of functions, are elections made by each company. These decisions are informed by the needs of customers, requirements of governing bodies, and the intuition, and knowledge of the industry, each company brings to the software design process. It is quite likely that many functions will be included in software of most reverse pharmaceutical distributions companies. However, it is the presentation of these functions, the ordering of the functions, the entering of data, among other factors, that makes software used by each company unique from its competitors.

      d.     Much of the information requested, from EXP and others, in the form of sample forms and computer generated reports can be obtained by Defendants from other sources. EXP has produced several sample reports to Defendants. These reports, and similar reports from competitors are widely available, both in form and content, from prospective and existing customers, from manufacturers, and on various websites. I am informed that Defendants may have had several EXP reports, in hand, before the Subpoenas were ever issued. The fact is that many reports are available, without resort to this Subpoena. Further, I am advised that Defendants have received reports, and possibly including Screen Prints, from several subpoena recipients in the reverse distribution industry. These reports reveal data and information that appears on the computer screen or screens that generated the reports.

    12.     The material sought by Defendants, while unrelated to the issue in the primary action, has tremendous competitive value to EXP. In fact, the software developed by EXP, and which will be disclosed if Screen Prints are revealed, now sought by Defendants, makes it unique

within the industry, and provides EXP with its true competitive advantage. The acquisition of this software, or information about this software, by a competitor, would offer a tremendous competitive advantage, and would result in insurmountable losses to EXP.

13. In order to control its business expenses EXP maintains administrative staff at minimum levels. It is not untypical that each member of the administrative team performs numerous functions, and works long hours. When the Subpoena was first received it was determined that the production of the items requested involved over 8,000 pages of printed material, 200,000 lines of code, and several hundred internal and customer reports. Even though the request has been narrowed, administrative resources of EXP will be expended to respond. I believe it is an abuse of the judicial process to permit warring competitors to gain access to the confidential information of EXP, and to burden the operations of EXP to produce the material. In both instances, and through no fault of its own, in responding to the Subpoena, EXP is rendered less competitive in the industry.

14. EXP has previously provided Defendants with information in compliance with the Subpoena. Customer reports, provided to EXP customers, and prospective customers, have been produced (See Declaration of Paul I. Myers III, in support of this Response). In response to this production, Defendants substantially reduced their request to include several screen images from computers operating the EXP software. (See Myers Declaration, Exhibit F). The production of these screen images will provide Defendants with an insight into the EXP software that is intrusive, a violation of proprietary information of EXP, and runs the risk of compromising the software.

15. EXP is aware of the "Restricting Order" (See Declaration of John D. Minton, Exhibit D). EXP believes that this Restricting Order does not adequately protect EXP, for the following reasons:

a.  I am advised that this Court, ruling on this Motion, has no enforcement power over the Restricting Order.

b.  If the Restricting Order is breached, EXP would have to travel to Illinois to protect its interests. This would involve additional expense to EXP. EXP does not have counsel in Illinois.

c.  Although EXP may be permitted to designate documents as "Highly Confidential Information" the parties may be able to challenge that designation, and view the documents. This would result in irreparable harm to EXP.

d.  Defendants admit that their use of produced material extends to offering such material as evidence at trial. The Restricting Order does not preclude disclosure of protected information at the time of trial.

16. Based upon the foregoing, I respectfully request that the Motion to Compel brought by Defendants, be denied. The value of the information to Defendants is minimal, and the potential damage to EXP is very real and potentially catastrophic.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and this declaration was executed on October 15, 2007, at Fremont, California.

GUS CHANGARIS
Chief Executive Officer
EXP Pharmaceutical Services Corp.